## CHARLES S. BALL, JR., et al., v. NEW YORK LIFE INSURANCE CO.

Eastern Section.   January 9, 1926.

Certiorari overruled by Supreme Court, June 24, 1926.

1. **Insurance.   Beneficiaries are not necessary parties to suit to cancel life insurance during life of insured.**

In an action to recover on a life insurance policy where the insurance company filed a cross-bill to cancel the policy and the policy reserved the right in the assured to change the beneficiary at will, held the beneficiaries did not have a vested interest and were not necessary parties to the suit as long as the assured was alive.

2. **Insurance.   Decree determines the rights of the parties as of the time suit is filed.**

In an action to contest a life insurance policy where the insured died during the progress of the suit, held that the decree of the court determines the right of the parties as of the date the suit is filed, and the insurance company was not barred from contesting the policy under a clause requiring the contest to be within two years because it had not made parties to the suit persons who at the time of commencement of the suit were not necessary parties.

3. **Pleading.   Withdrawal of a plea does not withdraw defendants appearance.**

Filing a plea is both appearance and a defense and its withdrawal does not withdraw defendants appearance.

4. **Courts.   Jurisdiction.   Where defendant appears he cannot withdraw his appearance.**

If a defendant who has not been served with process appears and thereby confers jurisdiction over his person, he cannot withdraw his appearance so as to prejudice the right of plaintiffs to continue the prosecution of the action without further process.

5. **Insurance.   Evidence.   Evidence held to show insured did not know of his ill-health at the time of making application.**

In an action where the insurance company sought to cancel a life insurance policy on the grounds that the insured was suffering from tuberculosis at the time of making application for insurance and knew or should have known of his condition, but stated that he was of sound health, held evidence sufficient to show that the insured did not know he had tuberculosis.

6. **Insurance.   It is the duty of the assured to make known his condition whether specially questioned or not.**

If the assured, when he makes his application, knows or has reason or ground to believe, that he has any disease, even though it may be latent and undeveloped, he is in duty bound to make it known, whether specially questioned or not; and if he fails to do so, it will amount to a misstatement or concealment, as the case may be, that will avoid his policy; but if there should be in him some latent disease, of which he knows and suspects nothing, has no means of ascertaining, he cannot be said to have either misrepresented or concealed the facts in such a sense as to avoid his policy. There can be no concealment of a fact which is not known and cannot be known by a proper inquiry.

7. **Insurance.   Evidence.   Burden in on the insurance company to show assured knew of his ill-health.**

In an action to cancel a life insurance policy on the ground that assured was in ill-health and knew it when making application for insurance, held the burden is on the insurance company to show that the assured knew of his condition or had reasonable grounds to believe that he was in ill-health.

8. **Insurance.   Evidence.   Fraud on the part of assured in making application for life insurance will not.be presumed.**

Where fraud is relied upon to avoid the payment of a life insurance policy, fraud on the part of the assured will not be presumed but it should be made to appear by such convincing proof as not to leave any doubt as to its preponderating character.

9. **Insurance.   Payment of notes to insurance agent unknown to the company will not bind the company.**

Where an insurance agent sold a life insurance policy and took notes for the premium and made payment to the company himself, held the payment of the notes to the agent after notice of assured's ill-health where the insurance company knew nothing of the payment of the notes did not estop the insurance company to deny payment of the policy.

10. **Insurance.   Where assured's disability is exempted under the policy he cannot collect disability benefits.**

Where a policy of insurance provided that disability benefits did not apply if the disability of the insured resulted from military or naval service and the evidence showed that assured's disability was caused from tuberculosis contracted while serving in the navy, held assured could not recover any disability benefits.

Appeal from Chancery Court of Washington County; Hon. S. E. Miller, Special Chancellor.

Modified and affirmed.

Sells, Simmonds & Bowman, of Johnson City, for appellant.

Miller, Depew & Lee, of Johnson City, for appellee.

SNODGRASS, J.   This controversy is over the question of a liability of the defendant for the amount of a disability benefit which accrued to complainant in his lifetime, and for which he sued, and also as to the liability of the defendant to the widow and two minor children of the complainant as beneficiaries, which accrued to them upon the death of the complainant, which took place during the pendency of-the suit.

The policy was applied for on September 14, 1922, was issued on September 19, 1922, and took effect from the date of the application.   Under the terms of the policy, upon the death of the insured his wife, Mrs. Nina L. Ball and his two children, Burrell Edward Ball and Jean Elizabeth Ball, as the named beneficiaries, were to receive the sum of $5000.   The policy contained a clause against total disability, in the event of which and after due proof thereof, the assured, Charles S. Ball, Jr., was to be paid at the rate of $50

per month during such disability, and which was also to excuse the payment of further premiums.

Some two months after the policy was taken out, as claimed by the complainant, it was discovered that he had tuberculosis, and a total disability was claimed thereafter and demand made for its payment. This was refused, and on September 6, 1923, he was notified that the policy was cancelled on account of false statements and alleged fraudulent misrepresentations contained in the application for the policy, which application was a part of the contract. Thereupon the assured, Chas. S. Ball, Jr., brought suit.

Pending his suit he died, and his case was revived in the name of Burrell W. Ball, his executor, and an amended and supplemental bill was filed by the executor, joining the widow in her own right and himself as next friend of the minors, to collect the $5000 accruing to them on the death of the deceased. The proceeding sought also the collection of a penalty alleged due as a result of the unreasonable delay in settlement.

To these bills, which also averred estoppel, answers were filed as cross-bills, and as incidents thereto a number of motions were filed and acted upon, with the interposition of certain pleas, and the cause finally coming at issue was heard by Special Chancellor S. E. Miller, on the whole record, including briefs of counsel. From all of which the court was of opinion that the complainants were entitled to recover for the disability sued for from the 1st day of March, 1923, until and including May 23, 1924, together with interest on each monthly payment from its due date, the principal thereof being the sum of $750 and $84.45 interest; and that complainants were entitled to recover of the defendant the face of the policy, together with interest thereon from the 19th day of September, 1924, on which date the defendant refused to pay and sought to rescind the face of the policy, amounting to $5000, together with interest amounting to $283.35, making in all the sum of $6158.84, for which the court gave a decree in favor of the complainants and against the defendants, and also for all costs of the cause. The court was further of opinion that the complainant was not liable for premiums after he had given proof of his disability to the defendant, and that complainants are not entitled to a return of the premium tendered into court on the —— day of August, 1925. The court was further of opinion that complainants are not entitled to the penalty sued for.

The defendant and cross-complainant excepted to so much of the decree as finds and adjudges and decrees that the complainant shall recover of the defendant the sum of $750 with interest thereon of $84.75 on account of disability from March 1, 1922, until and including May 23, 1924; also the giving of a decree or judgment for

the face of the policy sued on, to-wit, the sum of $5000, with interest on the same from September 19, 1924, amounting to $283.35; and also to so much of said decree as adjudges that complainants are not liable for the premium, being $125 due from the year beginning September 19, 1923, and ending September 19, 1924, and prayed, obtained and perfected an appeal to this court.

Complainants also excepted to the decree or refusal of the chancellor to allow any penalty, but did not appeal.

The assignments of error made by the defendant Insurance Company are as follows:

1. "The special chancellor erred in not finding, holding and decreeing that the complainant and cross-defendant, Charles S. Ball, Jr., was, at the time of making application for the policy of insurance, and has been for some years, suffering from a disease of the lungs known as tuberculosis; that, at the time he made said application, the disease had assumed an aggravated, incurable and malignant form, and was so far advanced as to render him totally disabled within about two months after making said application, and to put an end to his life within two years, notwithstanding all of the governmental means and agencies used to keep him alive."

2. "The chancellor erred in not finding and decreeing that the complainant and cross-defendant, Charles S. Ball, Jr., knew of his tubercular condition at the time of making said application, that his answers to questions regarding his health, to the effect that he had never suffered from disease of the lungs, nor of the heart, and had not consulted a physician about them, were made with actual intent to deceive and to defraud the defendant, and that the matters misrepresented increased the risk of loss, and that the defendant would not have accepted said risk, if the facts had been truly stated."

3. "The chancellor erred in not finding and decreeing that the said Ball, when he made his application aforesaid, had good and strong reasons to know and believe that he had the disease of the lungs called tuberculosis, and an ailment of the heart, even if not fully developed, and he was bound to make known to the company those facts, instead of denying it, as he did."

4. "The chancellor erred in not finding and decreeing that the condition of the said Ball, at the time of making said application and for some time theretofore, was such as would and should have put a reasonably prudent man, exercising ordinary sense and care for his health, on notice of the fact that he was afflicted with a malignant disease; and that, if he had used ordinary care and intelligence and have made inquiry

of a reputable and qualified physician, he could and would have been informed of his ailment.''

5. ''The chancellor erred in not finding and decreeing that the condition of said Ball was such, at and before the making of said application, and that his consultations with physicians had been such, that he was bound to know that he was afflicted with tuberculosis or some malignant disease, and he was bound to make this fact known to defendant.''

6. ''The chancellor erred in not holding and decreeing, because of the misrepresentations made by said Ball regarding his health, by the false statements made as to his not having suffered from nor consulted a physician about certain diseases, his false representations that he was in good health and a proper subject for insurance, and by concealment of material facts regarding his insurability, that the said Ball had deceived and misled the company into issuing him the policy in question and had thereby increased the risk of loss, and the said policy should be rescinded, cancelled and for nothing held.''

7. ''The chancellor erred in adjudging and decreeing that complainants, or any of them, are or were entitled to recover of the defendant the sum of $6158.84 or any sum of money whatever. He should have dismissed the bill at the cost of complainants.''

8. ''The chancellor erred in not finding in favor of the cross-complainants on the cross-bill, and in not rescinding and cancelling the policy sued on by complainants and cross-defendants.''

9. ''The chancellor erred in adjudging and decreeing that complainants are not liable for the premium due Sept. 14, 1923, of $125, with interest, even though the decree of the chancellor be sustained as to the other matters passed on.''

The chancellor filed a very able opinion, which more elaborately states the issues, in all of which we concur except in the particulars hereinafter stated, which points out our disagreement, and which effectually disposes of most if not all of the foregoing assignments, and which we adopt and file as our own opinion. except as to the points in which we disagree, which will be hereinafter pointed out.

''This suit was instituted by Charles S. Ball, Jr., in his lifetime, against the New York Life Insurance Company, to recover sick benefits under a policy issued to him on September 19, 1922. The beneficiaries named in the policy later joined in the suit. Mr. Ball became very ill in the late fall of 1922, made his will on May 20, 1923, and died on May 23, 1924. The suit was later revived in the name of his executor, and, as presently constituted, it seeks to

recover sick benefits and the face of the policy $5000, and the statutory penalty.''

''The policy reserves the right to the assured to change the beneficiary at any time, and it also provides that it shall be incontestable after two years, and one of the principal questions made in the pleadings is, that a contest was not instituted to the necessary parties within the prescribed time. If the position of complainant on this question be well taken, it is not necessary to discuss the merits of the controversy, because the entire defense would necessarily fail, on that ground. In order to a clear understanding of the position of counsel on this question and of the issues presented, it is necessary to make a full statement of the pleadings.''

''The original bill was filed September 11, 1923, by Charles S. Ball, Jr., and alleges that, on September 19, 1922, the defendant insured complainant's life, his wife and children being named as beneficiaries, and also insured complainant against permanent disability, the provisions of the policy relating to disability being quoted in the bill.''

''Complainant avers that at the time he took out the insurance policy he executed his notes running over a period of ten months, all of which were paid as they matured, the last payment made and accepted by defendant being on August 19, 1923; that at the time was issued complainant he was in good health but, in November following the issuance of the policy, he was advised he was suffering from tuberculosis; that from that time he was totally and permanently disabled, and has continually from that time been an inmate of the National Sanatorium, at Johnson City, that shortly after he became disabled he notified the defendant thereof, requesting it to pay him $50 per month, as it contracted to do; that defendant failed to make payments for disability and/but continued to collect the notes executed for premiums, and, on September 6, 1923, defendant notified the complainant that it elected to rescind the policy because of complainant's failure to disclose to it material facts as to his insurability, tendering to complainant a check for the insurance premium paid, which he refused to accept and returned to defendant. Complainant averred that he did not withhold material facts; that defendant was fully advised as to his condition and, with full knowledge that he was suffering from tuberculosis, it accepted payment of the notes he had executed, thereby waiving any rights it may have had, and it is estopped from contesting its liability on said insurance contract. It is further averred that defendant's refusal to pay is in bad faith and for which it should be charged with the statutory penalty of twenty-five per cent for all of which a recovery is sought.''

"The answer and cross-bill was filed on October 19, 1923. It admits the issuance to Ball of the policy, No. 8,280,842, for $5000, with his wife and children of said Ball as beneficiaries, but refers the court to the policy itself for its terms. It is also answered that whatever premium were accepted were accepted in ignorance of the facts in the case, and it is averred that the amount paid with interest had been tendered to complainant and same is brought into court and the tender is thus kept up."

"The answer denies that Ball was in good health when he made his application for insurance; and avers that he was bound to know and did know that he was suffering from disease of the lungs; that he falsely represents that he had never consulted a physician on account of, or had suffered from, disease of the heart, bloodvessels, or lungs, and that he had never been treated for, nor had consulted any physician on account of, any ailment or disease, except tonsillectomy in April, 1922, and some face trouble from which he had suffered from childhood."

"It is further answered that complainant, just over his signature for his application for insurance, agreed that his answers (which were made for the purpose of obtaining the policy of insurance) were full, complete and true; that he was a proper subject for life insurance; that he meant that the company should believe and rely on his said answers, and, believeing them to be true, would issue to him the policy applied for. Defendant further states that it did believe said statement, relying on them, issued the policy; but would not have done so, if the fact had been known to it. So the defendant pleaded and answered:"

"(1) That complainant wilfully and intentionally misrepresented the facts, with intent to deceive, mislead and defraud defendant and, by such false representations, breached the contract between the parties and is not entitled to recover."

"(2) That complainant, in fact and law, made the misrepresentations detailed in the answer, and thereby deceived, induced and led defendant into entering into the insurance contract, which it would not have done but for such misrepresentations, also that by such false representations and deception, the complainant practised a fraud upon the defendant, on account of which he is not entitled to recover."

"(3) That complainant, from a date quite long anterior to his application for insurance, in which said false representations were made, was being paid compensation by the government on account of a pulmonary disease which the government physicians and officials had found he was afflicted with, and he was thereby affected with notice that his lungs were diseased and that physicians had

been consulted on the subject, and it does not lie in his mouth to · say that he did not know that his lungs were diseased at the time of his making said application or even that he had forgotten or did not think of that fact, when he made his said application. Therefore, respondent pleads and answers that complainant is estopped to say that he did not know, in making said application, that he had been treated for disease of his lungs, and that the information he gave on the subject was false and misleading, and on such defense of estoppel, which is hereby particularly and especially pleaded, as well as the other defenses above set forth, respondent relies.''

''It is further answered that material facts were withheld from defendant, which, if it had been advised of, would have prevented defendant from accepting said application and issuing said policy. It is denied that there was actual change in the complainant's health on September 14th to 19th, 1922; and on November 14, 1922, on which date complainant says he first knew he had tuberculosis, or when, as he says in his application to defendant for sick benefits, his disease began. He is alleged to have been suffering from this disease long before that and knew it.''

''That it was not until about August 20, 1923, that defendant learned the truth about Mr. Ball's condition; at which time it got a letter from the director of the U. S. Veteran's Bureau, showing that said Ball had 'been drawing compensation for pulmonary tuberculosis, chronic, active, from July 17, 1920.' So it is evident that the assertion that his disease began on November 14, 1922, is untrue.''

''It is denied that defendant accepted any payment of premium with knowledge of the facts in the case. Such as were accepted were received under the supposition that complainant had made true and correct statements in his answers to the questions to his application, and defendant, as soon as it got at the facts, repudiated the .contract and cancelled the policy, at the same time tendering to the complainant what he had paid, with·interest. So respondent denies owing to complainant anything, having tendered and placed in court the amount it received with interest.''

''Then, after having answered, relying on the allegations in the answer contained, the said answer was filed as a cross-bill, the object and prayer being to have the said policy or contract of insurance declared to have been obtained by fraud and misrepresentation, fraudulent, inequitable and void, and that it be cancelled and for nothing held. Along with the filing of this cross-bill the defendant (cross-complainant) filed a cost bond.''

''An amendment to the bill was filed on March 10, 1924, wherein it was alleged that further sums had accrued under the policy; that

defendant had refused to pay; that its refusal was in bad faith, causing complainant further trouble and expense, and praying for $50 per month, since complainant's disability began, together with interest and the statutory penalty.''

''An answer to the cross-bill was filed May 3, 1924, denying all of the material averments contained in the cross-bill. It was specifically denied that complainant had been drawing compensation from the Government on any account prior to his application and securing insurance from defendant, or that he had consulted a physician relative to any disease, or that he had knowledge of any such disease, prior to the time he took out the policy with defendant.''

''Motion and order to amend the cross-bill was made and allowed on May 10, 1924, making Nina L. Ball, widow, and Burrell W. Ball and Virginia L. Ball, minor children of complainant, parties defendant to the cross-bill.''

''On September 8, 1924, the death of Charles S. Ball, Jr., was suggested in open court, and the case revived in the name of his executor, widow and children, who were permitted to file an amended and supplemental bill, seeking to collect the full amount of the policy.''

''Amended and supplemental bill was filed October 21, 1924, by Burrell W. Ball, Executor for Charles S. Ball, Jr., Mrs. Nina L. Ball, his widow, and by Burrell W. and Nina L. Ball, as next friends of Burrel W. Ball and Jean Elizabeth Ball, minor children of said Charles S. Ball, Jr., wherein it was alleged that Charles S. Ball, Jr. died intestate on May 23, 1924, leaving B. W. Ball his Executor, his widow and two minor children surviving him. The filing of the bill and answer, and taking of proof thereon is set forth; that shortly after May 23, 1924, complainants notified defendant of the death of said Charles S. Ball, Jr., requesting it to furnish them with its regular form that they might prepare and file with it proof of death; that the defendant refused to furnish such blanks and thereafter complainants accrued other blanks and, on September 13, 1924, sent same properly filled out to the defendant, that same were returned to complainants by defendant on September 19, 1924, the letter with which they were returned being filed as exhibit ''B'' to the amended and supplemental bill; that defendant's acts in refusing to furnish blank forms when called upon amounted to a waiver of proofs of death. It is alleged that Virginia L. Ball, one of the beneficiaries named in the policy died before Charles L. Ball, Jr. and that he left surviving him his widow and two children named. It is averred that the complainants are entitled to recover of defendant the sum of $50 during the disability of Charles S. Ball,

Jr., together with interest on each item from its due date, and the further sum of $5000 with interest thereon, and the statutory penalty, defendant's refusal to pay being in bad faith and causing complainants additional trouble and expense. Prayer was for an answer, not under oath, and for a recovery for the full amount due under the policy."

"Answer and cross-bill of the insurance company was filed November 12, 1924, wherein it reasserted the same defenses set up in its former answer. It admitted the death of Charles S. Ball, Jr., it admitted the receipt of request for blank proofs of death shortly after May 23, 1924, and its refusal to furnish the same; it alleges that other proofs of death were filed with it and it returned same to complainants. The sending of the letter, exhibit "B" is admitted. It again reasserts 'all defenses set up in the answer to the original bill,' assumes the position of a cross-complainant, prays for process against all of the complainants, and prays that the policy be cancelled because of fraud practiced upon it at the time the policy was applied for."

"November 14, 1924, the complainants filed an answer to the amended cross-bill, filed May 10, 1924; but, by order of November 20, 1924, were allowed to withdraw said answer from the files."

"On November 20, 1924, the complainants moved to strike the amendment to the cross-bill, filed on May 10, 1924, because no cost bond was filed and because no process issued thereon."

"Thereupon the defendant asked leave to file a cost bond and leave so to do was granted, but without prejudice to the rights of complainants."

"Cost bonds were filed by cross-defendants on November 21, 1924. Process issued same day and the/was executed December 1, 1924."

"On November 21, 1924, the bill was amended so as to allege that Burrell W. Ball was the regular guardian of B. E. Ball and Jean Elizabeth Ball, and relief prayed for in their behalf, etc."

"On November 28, 1924, the complainants filed what is termed a plea, alleging that the defendants, until the filing of its cross-bill on November 12, 1924, insofar as the beneficiaries are concerned, took no action to rescind or cancel the insurance policy; that said policy, issued September 19, 1922, contains an incontestible clause after two years; that defendant took no action contesting the validity of the policy against the beneficiaries for more than two years after its issue; that having failed to take such action within said period it waived all defenses thereto, and it is now estopped from pleading or relying upon the defenses sought to be set up and pleaded in its cross-bill."

"It is further averred that cross-complainant executed and filed no bond on its alleged amendment of May 10, 1924; that it failed

to have process issued and served; that the defendants to said attempted amendment never entered their appearance to said cross-bill nor waived the issuance of process, and cross-complainant by its laches abandoned its cross-action. That defendant did not within two years from the date of said policy institute any action to cancel or rescind the same, and its right to contest said policy is barred under and by virtue of the terms of the policy made exhibit "A" to the pleas.''

"And it is further averred that defendant, shortly after the issuance of the policy, was fully advised as to the physical condition of Charles S. Ball, Jr.; that thereafter, by its note and conduct, it waived all right to contest said policy; or to work a forfeiture of the same; all of which acts and conduct are pleaded as an estoppel against the defendant and cross-complainants.''

"On May ——, 1925, a further amendment was made showing a further formal demand for payment on March 4, 1925, which it is alleged was peremptorily refused a few days later.''

"On July 16, 1925, or about the same time the case was submitted to the court, the defendant moved for an order on the complainants to restore to the file the answer filed on November 16, 1924, or that a copy thereof might be substituted therefor, for the purpose of showing the appearance of said parties defendant to the cross-bill.''

"This was followed by a motion, on August 7, 1925, by complainants for an order to strike from the files the various cross-bills, for the reason set forth in motion formerly made and for the further reason that the defendant had never tendered to complainants the amount of the premium paid by the complainant, Charles S. Ball, Jr.''

"The Insurance Company was by order on August 7, 1925, allowed to amend its cross-bill, by alleging and praying in the alternative that it might contest the enforcement of said policy, on the ground that the second premium was not paid, or the payment thereof tendered and kept up, as provided by the terms of the contract, and that the bill be dismissed on that ground; or in any event, that the company have credit for said premium, in the event the court should decree that complainant is entitled to have said policy enforced.''

"This last amendment was answered by complainants on August 17, 1925, alleging that the amount of the premium due on September 14, 1923, was tendered to the defendant and refused, and that the company was now estopped from insisting that the premium was not tendered; it is further alleged that by the terms of the policy no further premiums are due after proof of disability; that proof of disability was furnished prior to September 14, 1923. It is

further alleged that, while no premium was in fact due, complainant's brother had tendered the premium and was willing at all times to pay it; and complainants now come and tender into court for the defendant the sum of $125.55, with interest from September 14, 1923. Said sum is alleged to be tendered without reservation or condition, but the court is asked, in the event the defendant refuses to accept the same, to construe the policy and determine whether or not the premium was due the defendant, etc.''

"It is further alleged that by the amendment of August 17, 1925, the company had assumed a position wholly antagonistic to, and inconsistent with, its former position, in that, by insisting that the premium due on September 14, 1923, should be paid, it admits that the policy was a valid and enforceable contract from said date and for one year therefrom; and complainants plead estoppel and allege that defendant is estopped from insisting that the policy was not in force and effect at the date of the death of Mr. Ball.''

"On August 24, 1925, the defendant tendered into court the sum of $133.10, mentioned in the original answer and cross-bill.''

"The opinion of the court with regard to said motions last referred to is clearly indicated by what follows, and said motions will not be otherwise or more definitely ruled upon.''

"The first question for determination then is, whether a contest of the contract of insurance was commenced by the necessary parties within two years from its date.''

"The suit was commenced by Ball in his lifetime and promptly answered by the Insurance Company well within the two years period, by answer and cross-bill, attacking the contract for fraud as shown by the pleadings above referred to. The theory of complainants seems to be that the beneficiaries named in the policy were necessary parties in order to contest the contract of insurance and that they were not regularly made parties, within the two year period, within which a contest could be made. In any event it is insisted that the beneficiaries were necessary parties after the death of the assured, he having died within the two year period, and it is insisted that they were not regularly made parties within that time. The theory that the beneficiaries were necessary parties is based upon the idea that they had a vested interest in the contract of insurance. As before indicated the policy reserved the right in the assured to change the beneficiary at will, and, under such circumstances, the court fails to see how the beneficiaries could have any vested interest, as long as the assured was alive. The court so holds and sites: Davis v. Davis, 136 Tenn., 520; Reid v. Durborne, 272 Fed., 99; In re Greenburg, 271 Fed. 258; Malone v. Cohn, 236 Fed., 882; Hopkins v. Northwestern, Fed. 199.''

"Mr. Ball himself, while alive, was the only necessary party, on his side, to contest his contract of insurance; it was assailed by answer and cross action against him on the ground of fraud; the suit continued as long as Ball lived and was revived in the name of his Executor, widow, etc., after his death, and it seems the most natural and logical thing that this contest, going to the very life of the contract itself would follow to the end of the suit, and that the decree of the court would date back and determine the rights of the parties as of the date of the contest. It is true that the rights of the beneficiaries became vested upon the death of assured and that they became proper parties at that time, but the court is of the opinion that the interest of the beneficiaries in said policy of insurance, under the circumstances, was made to depend on the result of said contest, regularly made, in the lifetime of the assured and kept up by his representatives. Counsel for complainant does insist that the Insurance Company did not make the contest against Ball within the two years, because it did not tender and keep up its tender of the premiums paid. However, the Company did send Mr. Ball a check, for the premium paid, which he refused to accept and returned to the Company. The Company sent the check a second time and Mr. Ball declined a second time and returned the check to the company. Under the circumstances the court is of the opinion that the Insurance Company was not thereby barred from contesting the contract of insurance; and for the reasons stated above, said contest was regularly instituted within the two year period."

"But if mistaken as to the position above taken, the court is of the opinion and holds that the complainants made themselves parties to the suit, and gave the court jurisdiction of their persons by their answer filed on November 16, 1924, to the supplemental cross-bill of the defendant. True this answer was allowed to be withdrawn, but it is held that that was not effective to deprive the court of jurisdiction of the parties answering, to say nothing of the effect of the motion, on the question of jurisdiction, made in the cause by the same parties, about the same time, and the subsequent filing of a plea, which is not a plea to the jurisdiction, to say the least of it."

" 'In support of the above we quote from defendant's brief, to-wit:

'It is said that the withdrawal of the pleas of Anson Elred left the case as to him as though he had never filed the plea, and that never having been served with process he was not liable to the personal judgment of the court.'

'We do not agree with this proposition. The filing of the plea was both an appearance and a defense. The case stood for the time between one term and another with an appearance and a plea. The withdrawal of the plea could not have the effect of withdrawing the

appearance of the defendant, and requiring the plaintiff to take steps to bring that defendant again within the jurisdiction of the court. Having withdrawn the plea he was in condition to demur, to move, to dismiss the suit, if any reason for that plea could be found, or to file a new and different plea if he chose, either with the other defendants jointly or for himself. He was not, by the withdrawal of the plea, out of court. Such a doctrine would be very mischievous in cases where, as it is very often, the first and only evidence of the appearance, of a party is the filing of his plea, answer or demurrer. The case might rest on this for a long period before it was ready for trial, when, if the party could obtain leave of the court to withdraw his plea (a leave generally granted without objection), he could thereby withdraw his appearance, the plaintiff is left to begin de novo. Elred v. Bank, 17 Wall., (84 U. S.) 545; 21 L. Ed., pp. 685, 686 687; Creighton v. Kerr, 20 Wall., (87 U. S.) 8; 22 L. Ed. pp. 309, 311.'

'In 9th Rose's Notes on U. S. Reports, pp. 120-121, annotating Elred v. Bank, supra, it is said:

'Filing a plea is both appearance and defense and its withdrawal does not withdraw defendant's appearance.'

"This is supported by many authorities there cited. The general rule is as announced above. As it is said in 2 R. C. L., pp. 323-324, Sec. 3:

'After a defendant, who has not been served with process, appears and thereby confers jurisdiction over his person, he can not withdraw his appearance so as to prejudice the right of the plaintiff to continue the prosecution of the action without further process. The appearance remains, although his attorney by whom it was entered withdrawn. It gives rights and benefits in the conduct of the suit, to destroy which by the withdrawal of the attorney would work great injustice to the other party.'

"In support the U. S. cases above cited are relied on as authority in 2 R. C. L. supra. Also, in addition to the following we refer the court to headnote 3 in the case of Young v. Vail, which is:

'When a party brought in by cross-complainant appears, he becomes a party to the whole suit and is bound by the judgment as to all matters which are or might be litigated therein, including the matters covered by the complaint and by the cross-complaint; and, if the complaint be defective, by reason of his not having been made a party, such defect is cured by subsequent appearance.'

"The court refers to Ayers v. Carver 17 Howard, (U. S.) 519, 15 L. Ed. 179, which holds that the original bill and cross-bill constitute only one suit, the cross-bill being auxiliary to the proceeding

in the original suit. Such is the suit at bar, and complainants, as cross-defendants having appeared, they are and will be bound by the judgment or decree to be entered as to all matters litigated herein. Young v. Vail, N. M. Sup. Ct., 34 Am. Law Rep., 981, 986, 987.''

"It follows that the case should be considered on its merits, and the first question for determination is, whether Mr. Ball knew that he was suffering with tuberculosis or other disease when he applied for the policy in September, 1922; if he did, and make false statements about his condition to the insurance company's medical examiner, or if, by his silence, he concealed his true condition, and thereby mislead and deceived the examiner, he could not recover; neither could he recover, if he was in possession of information which would lead a reasonably prudent man under all the circumstances to conclude that he was suffering with an incurable disease at the time of the application and failed to place such information before the medical examiner.''

"As the court views the situation, this is the important and controlling question in the case. Let us therefore examine the evidence, on which the insurance company relies, to show that it was deceived, and insisted upon. But before examining this evidence, the situation of the parties at that time was, that the company had issued the policy on September 19, 1922; had later received information in the form of a letter from Frank D. Hines, Director of United States Veterans Bureau, Washington, D. C., to the effect that the assured had been drawing compensation for pulmonary tuberculosis from January 17, 1920; and had on September 6, 1923, written a letter to the assured undertaking to rescind the contract of insurance on the ground that the assured had failed to disclose material facts as to his insurability. The assured made application for sick benefits within six months from the date of the policy, which early application, no doubt, caused the investigation to be made by the insurance company. It developed that the information which the insurance company received from Director Hines was incorrect; that Mr. Ball had not drawn compensation from the United States Veterans Bureau from July 17, 1920; that he did not make application for same until January, 1923, which was, when allowed made retroactive and to date from November 21, 1920. Just what bearing this erroneous information may have had on the decision of the company to contest the contract of insurance, it is impossible to state, and needless to speculate.''

"The insurance company introduces and relies upon the application of Mr. Ball, made on November 21, 1922, for compensation and vocational training, which application is sworn to, in which he states that the nature of the disability claimed was "T. B. and leaking

heart; that the disability began about December 1st, 1918, and that he didn't know the cause of the disability, unless it was over-exertion and hardship.'' It appears from this application that Mr. Ball entered the service on June 2, 1917, and that he was discharged on August 9, 1919, and he gives the names of Dr. Parrish and Dr. Smoot as the physicians who had attended him for his disability. Defendant also relies upon an affidavit of Dr. Parrish procured and used by Mr. Ball in his application for compensation to the Government, in which affidavit Dr. Parrish states that he first examined Ball on July 17, 1920; that his complaint was coughing, shortness of breath on exertion, night sweats and soreness of left lung; that on physical examination he found 'dulness over left lung on percussion, dry rales on auscultation;' that he diagnosed the case as pulmonary tuberculosis; that the prognosis was not favorable; that he attributed the disease to military service, because he had been Ball's medical adviser, and that Ball was a healthy and robust man before entering the service; that Ball left Nashville immediately after his examination and he did not see him any more until August, 1921, at which time he was not improved, but had a throat trouble. Defendant also relies on an affidavit made by Dr. Smoot and used by Mr. Ball in his application to the Government, in which Dr. Smoot says he examined Ball on November 14, 1922, and diagnosed his disease as pulmonary tuberculosis, and in which he uses the following language: 'I do believe the claimant's disability is attributed to his military service, for the following reasons: from the extent of lung involvment at the time of examination and the history of its development, patient stating he had suffered with cough and severe pains in the left side some fifteen months before examination. I believe the beginning of trouble dates back eighteen months or longer.

''Defendant also relies on an application by Mr. Ball on January 22, 1923 for 'War Risk Term Insurance,' in which he stated that he was disabled by pulmonary tuberculosis and leaking heart; also that Dr. Parrish gave him chest examination 'July, 1920, August 1921, Tonsil and general advice. Also Dr. J. L. Bryan, Dr. Smoot March, 1022.' ''

''Defendant next relies upon a letter written by Mr. Ball on April 29, 1923 to Hon. M. Bryson, District Manager, U. S. Veterans Bureau 5th District, Atlanta, Georgia, which says: 'About two or three weeks ago I received advice from your office that my rating had been changed on March 9th last to Total Permanent Disability, dating back to date my hospital records were made, on December 6, 1922. Since Dr. H. B. Parrish diagnosed my ailment as Pulmonary Tuberculosis in July, 1920, and Dr. M. A. Smoot and Dr. Parrish both told me in November, 1922, that my condition was serious, also X-ray and sputum tests substantiated those statements, I have been

thinking that a review of my files might be justified. Should you concur in this opinion I would appreciate a review of files with the idea of readjustment in back compensation, if just.' "

"Defendant also relies on the deposition of Dr. H. B. Parrish, who testifies that he examined Ball in July, 1920, and thought his lungs were weak, that he suspected tuberculosis but did not· tell Ball of his suspicion on account of the mental effect it might have on him; that he next examined him in August, 1921, that his condition was worse, and that he told Ball of his condition at the time of this second examination, and the witness says: 'I meant to tell you that he made two visits to my office, and on the last visit I advised him of the condition he was in.' "

"In the light of this evidence, on the question of knowledge of Ball of his condition, at the time of the application, let us .check up the same and see how it tallies with the position of the assured."

"Mr. Ball entered the military service on June 21, 1917; he was assigned to the Navy in transport service; the boat on which he was sailing was torpedoed by a German submarine on May 31, 1918, so that the men had to abandon the ship and take to life boats and rafts; after drifting for about fifteen hours the shipwrecked men were picked up by U. S. destroyers; before the men were picked up they were subjected for about eighteen hours to exposure, privations, hardships, and consequence of the shipwreck. Mr. Ball continued in the service for sometime, subsequently he was a Y. M. C. A. Secretary, and received an honorable discharge on August 9, 1919. The record discloses that he was a man of good intelligence, a member of the church, of good character and worthy of credit as a witness. He testifies that he knew nothing of the fact that he was suffering with tuberculosis until he was examined by Dr. Smoot, on November 16, 1922, and was told that his lungs were weak, and later told that he had tuberculosis by the hospital authorities at Nashville."

"It will be observed that the testimony of Dr. Parrish and the testimony of Mr. Ball are in direct conflict on the question of knowledge on the part of Mr. Ball of his condition; it is insisted/by the defendant that Dr. Parrish told Mr. Ball in August, 1921 that he had tuberculosis, and that, other evidence referred to above, corroborates the statement of Dr. Parrish; while the complainant insists that the evidence as a whole does not sustain Dr. Parrish, but rather sustains the statement of Mr. Ball."

"It is proper to consider the application of Mr. Ball for compensation, etc., and the.affidavits of Dr. Parrish and Dr. Smoot first, because they are first in point of time; and it is proper to consider them together, because made about the same time and for the same

general purpose. Mr. Ball had just a week before been examined and definitely found to be suffering with tuberculosis; it is fair to assume that he knew what was in the two affidavits when he made his application to the Government, because he used them in support thereof; the question then is whether these papers sustain the testimony of Dr. Parrish to the effect that he told Mr. Ball in August, 1921 that he was suffering with tuberculosis, or whether they show independently that Ball knew of his condition. Perhaps it should first be noted that Dr. Parrish under date of September 24, 1923, made an affidavit, or certificate, or statement, filed as Exhibit "A" to his deposition, in which he states that the second time he saw Mr. Ball was April, 1922, not August 1921, as shown in affidavit, when he advised him to have his tonsils removed. This paper closes with the following statement: 'This in no way indicates that the patient knew of any impairment of his health, except in April, 1922, relative to his tonsils, and on November 26, 1922, when Dr. M. A. Smoot made the fact known to him of active pulmonary tuberculosis.' The testimony of Mr. Ball is to the effect that he visited Dr. Parrish only twice, once in July, 1920, and a second time in April, 1922, relative to his tonsils. Dr. Parrish says whether the second visit was in August, 1921, or in April, 1922, he told him of his tubercular condition; but to say the least of it, his conflicting statements as to dates, and the inference thrown out from the statement of September 24, 1923, to the effect that 'this in no way indicated that the patient knew of any impairment of his health, except on November 16, 1922, when Dr. M. A. Smoot made the fact known to him of active pulmonary tuberculosis,' thus contradicting his affidavit, very much weakens his testimony, and makes one doubt whether he was not also mistaken as to the fact of telling Mr. Ball of his tubercular condition, and whether Mr. Ball was not correct when he says the second visit was in April, 1922, and with regard to his tonsils alone.''

"Now, what is shown by said papers? It will be noticed from the affidavits of Drs. Parrish and Smoot, that one of the questions asked by the Government was, whether the claimants disability was attributable to his military service. Both affiants state that they believed that the disability was attributable to military service and gave their reasons, so that it is easy to see what might have prompted the claimant in his application so say, in substance, 'the disability began about December 1, 1918.' It is equally easy to see what might have prompted Mr. Ball to say, that the nature of his disability was 'T. B. and leaking heart.' His doctors were just at that time certifying the fact of tuberculosis to the Government, and had told him that he had the disease. When Mr. Ball stated that, 'it began about December 1, 1918,' he was evidently referring to his disability,

and not to the disease of tuberculosis, because there is no evidence whatever in the record, and no claim by anybody, that had tuberculosis that far back. Dr. Smoot indicates that the trouble might have dated back eighteen months from November 25, 1922, as indicated from severe pains in left side and cough for about fifteen months.''

''And then the application for War Risk Term Insurance made on January 22, 1923, contains but a summary of statements in said affidavits, and in the application for compensation and vocational training, to-wit: 'disabled by pulmonary tuberculosis and leaking heart; also that Dr. Parrish gave him chest examination, July, 1920, August, 1921, tonsils and general advice. Also Dr. J. L. Bryan, Dr. Smoot, November, 1922.' So that there is nothing here corroborating Dr. Parrish.''

''And, finally, the letter of Mr. Ball written to the Veterans Bureau, on April 29, 1923, contains the clause, 'since Dr. H. B. Parrish diagnosed my ailment as pulmonary tuberculosis in July, 1920, and Dr. M. A. Smoot and Dr. Parrish both told me in November, 1922, that my condition was serious, also X-Ray and sputum tests substantiated these statements' etc. This language hardly corroborates Dr. Parrish. The letter does not state that Dr. Parrish diagnosed his case as tuberculosis in July, 1920 and advised him of the fact at that time, but it appears both from the testimony of Dr. Parrish and Mr. Ball that Dr. Parrish did not tell Mr. Ball in July, 1920 that he had this disease. So that there is nothing in this letter strengthening the testimony of Dr. Parrish to the effect that he told Mr. Ball in August, 1921 of his real condition. It will be seen from said papers, letters, etc., that they are susceptible of a construction not inconsistent with the testimony of Mr. Ball, and the burden of proof is on the insurance company to show by satisfactory proof that Mr. Ball knew of his physical condition when he applied for the policy. In other words, it is well within the bounds of the possible, that Mr. Ball got the information as to his condition, and as to the fact of his disabilities dating back to the beginning of his war record, as he says, from his doctors on and after November, 1922, which being true, the question is: Has the insurance company, under the circumstances, carried the burden of proof? The court thinks not. So far as this record is concerned, Mr. Ball is equally as credible a witness as Dr. Parrish; he is so positive that Dr. Parrish did not tell him that he had tuberculosis as Dr. Parrish is that he did, and the court is able to find no evidence which satisfies the mind and enables it to repose in the security that no mistake would be made, by holding that the insurance company had carried the burden of proof on this question; and so the court holds and finds that

the insurance company has failed to show that Mr. Ball knew he had tuberculosis at the time he applied for the policy.''

''But the insurance company insists that Mr. Ball was suffering with tuberculosis, at the time he made application for the policy; that he represented that he was not; and that such representation was one concerning the existence of a fact, which, not being true, avoids the policy; and the case of Bleckman vs. Casualty Company, 117 Tenn., pp. 585-586; and other authorities are cited. Mr. Justice Neil makes the following statement:

'The substance of these decisions is that where the statement is one concerning the existence or non-existence of a given fact, there can be no recovery, if the matter be not truly stated, whether such failure to state with truth and correctness be the result of fraud or of innocent mistake; but that, if the statement be as to a matter of opinion merely, a lack of accuracy will not cause a forfeiture of insurance, if such statement was made honestly and after the exercise of due diligence to learn the truth of the matter so represented.'

''It is also held in 92 Tenn., 508-513, as follows:''

'If the assured, when he makes his application, know, or have reason or ground to believe, that he has any disease, even though it may be latent and undeveloped, he is in duty bound to make it known, whether specially questioned or not; and if he fails to do so, it will amount to a mistatement or concealment, as the case may be, that will avoid his policy; but if there should be in him some latent disease, of which he knows and suspects nothing has no means of ascertaining, he can not be said to have either misrepresented or concealed the facts in such a sense as to avoid his policy. There can be no concealment of a fact which is not known and can not be shown by a proper injury.'

'It is further held that a statement concerning one's bodily condition with respect to obscure or undeveloped disease would be a mere matter of opinion, and that the insured would not be responsible for a misrepresentation as to such a matter, unless he had reason to believe that the representation was false.' 117 Tenn., p. 585.'

''The court is of the opinion, from all the evidence, that Mr. Ball was suffering with tuberculosis at the time he made application for the policy, but upon the authority of the cases just cited, it does not necessarily follow that Mr. Ball could not recover.''

''The remaining question in this connection is whether Mr. Ball had reasonable grounds to believe that he had tuberculosis and failed to disclose the fact to the agents of the insurance company. The evidence relied upon to show that he should have known, is the statement in the Parrish affidavit that when he examined him in July, 1920, his complaint was coughing, shortness of breath on exertion, night sweats and soreness in the left lung; the statement in the

Smoot affidavit that patient stated he had suffered with cough and severe pains in left side some fifteen months before examination; the testimony of Dr. Smoot to the effect that Mr. Ball told him he had had a bad cough for sometime, a year or more, as he remember the fact; that he had tonsils removed with but slight relief, that otherwise he felt well, except that severe coughing spells were weakening him; and the further fact that Mr. Ball had sore throat in 1921-2.''

''The coughing spells mentioned by Dr. Smoot likely had reference to his condition in November, 1922, because he had not seen Mr. Ball before that time; and likewise the affidavits were made in 1922, at which time his condition had become apparent enough for his mother to urge him to have an examination, while he still insisted that it was nothing but a cold and sore throat from the effects of the tonsil operation. The disease evidently had been creeping upon him in slow and stealthy fashion for sometime, suddenly becoming worse around November, 1922. The record does not disclose the extent of his cough, or shortness of breath, or soreness of lung, or night sweats, prior to November, 1922; it does not show whether these symptoms were intermittent or continuous. It is a matter of common knowledge that it is not every cough, even of considerable duration, that leads to consumption or tuberculosis. The same is true of soreness of lungs, for this disease, very often, is said to be accompanied with little soreness of lungs; and the same is true of night sweats and sore throat. It becomes necessary, therefore, to inquire into the apparent condition of Mr. Ball's health prior to November, 1922, and determine whether it was such as to negative the idea that the symptoms which he had pointed to tuberculosis or other fatal disease. Mr. Ball was a man of robust health to begin with; the illness which he had, referred to above for sometime made slow inroads on his constitution, because the effects were not evident to himself, nor his wife, mother, father, nor to the Postmaster and a co-worker in the post office at Nashville, where he worked as Clerk. Neither were the effects apparent to the agent of the defendant life insurance company nor to the medical examiner who examined him; one of these parties solicited the contract of insurance in question, the other as agent of the company examined and passed him, certainly as apparently in good health and as to such desirable insurance risk, and neither is called to testify as to such material matters; and failing to be called, there is thereby created a clear presumption against the defendant to that extent. If the insured was in such apparent good health as that the members of his family, and a medical examiner examining him for life insurance, detected no ostensible impairment of health,

it seems not unreasonable that he himself was not warned and not alarmed on account of such ill health as he may have suffered."

"Here again the burden of proof rests with the insurance company and the court is of the opinion that the company has failed to carry that burden."

"It was not unusual, not unreasonable for the assured, under the circumstances detailed in this record, not be impressed with the fact that he was suffering with tuberculosis."

"As bearing on both the question of knowledge on the part of Ball of his condition and on the question of whether he should have known, it will be remembered that, as a World War Veteran, he was entitled to government compensation for illness and for such disability as might develop reasonably traceable to his military service and it seems the most natural and reasonable thing, if he knew or suspected that he had tuberculosis back in 1921, that he would have determined the matter and applied for relief from the National Government or for treatment in some of the numerous hospitals erected for that purpose, the very thing he did immediately after he claims he was advised of his condition. Furthermore, the condition of his health was such as to enable him to continue his duties as an employee of the post office at Nashville, Tennessee right on up to November, 1922. At that time, when Dr. Smoot told him he had the disease, he was surprised and said that was the first time he had been so advised. His wife was surprised, the members of the family were surprised, all of which seems to be quite inconsistent with the theory that he knew, or should have known that he had tuberculosis."

"This record does not reveal the character of a man, who, with a fatal malady relentlessly bearing down upon him, was trying to cheat and defraud an insurance company out of five thousand dollars just before his final undoing, so far as this world is concerned. But he is shown to be a man of good character. His testimony given in support of his claim, and letters written by him, do not bespeak the character of a cheat and fraud. For illustration, reference may be had again to a letter of Mr. Ball on April 29, 1923, written to Honorable M. Bryson, District Manager, U. S. Veterans Bureau, Atlanta, Georgia. This letter is seeking a review of Mr. Ball's record with the view of securing compensation dating back to the time when the doctors said his trouble began. The letter is couched in respectful and dignified language, and asks for consideration, if found to be just and proper, the closing paragraph being as follows: 'Should you concur in this opinion I would appreciate a review of files with the idea of readjustment in back compensation if just:' and, nowhere so far as that the court is able to see, is disclosed a

purpose on the part of Mr. Ball to put over a great wrong on the insurance company.''

''The company solicited the contract of insurance; its agents carefully examined Mr. Ball and issued the policy to him. Later the company repudiated the contract for fraud, necessarily assuming the burden of the proof on that question, which the court under all the circumstances is constrained to hold it has failed to carry.''

''In this view of the case, it is not necessarily to further consider, or pass upon, the various other questions of estoppel, etc., made and relied upon by the parties.''

''There is nothing in the record to show that the defendant acted in bad faith so as to warrant the imposition of any penalty upon the company, but a decree will be awarded for the sick benefits sued for, and interest thereon from the date the same should have been paid, and for the face of the policy, and interest on same from the date same should have been paid, and all/for the costs of the cause.''

''Under the terms of the policy the company agreed to waive the payment of any premium falling due after approval of proof of disability. But the company could not wrongfully refuse to accept the proof and thereby continue to insist on the regular payment of premiums, and the court is of the opinion that the assured was not liable for the premium falling due on September 14, 1923.''

''A decree will be drawn and submitted for approval in accordance with this opinion and allowing necessary time for appeal.''

To this it might be added that Section 3306 of Shannon's Code provides that

''No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor by the assured, or in his behalf, shall be deemed material, or defeat or void the policy or precent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter represented in crease the risk of loss.''

And that in relation thereto it has been held:

''Whatever the form of the agreement in the application may be, the above statute incorporates itself in every policy of insurance issued, after it becomes operative, and serves as an effectual bar to the destruction of the right of the beneficiary, whose innocent mistakes of facts which are not material to the risk have been made.'' Insurance Co. v. Stalling, 2 Cates, 167.

A very able argument is made designed to establish that on September 14, 1922, when the deceased made his application for insurance, that he must have known or had reason to believe that he was suffering from tuberculosis. Reviewing the various affidavits

that were filed with the department and the various examinations that were made indicating the origin and progress of the disease of the lungs with which the insured was actually suffering at the time of his exmination, but it is well known that this disease is both insiduous and irregular in its course and tenure, and that those who have it are sometimes the last to realize or suspect it, we do not construe the statements of earlier symptoms such as cough, shortness of breath and pain in the chest to mean that they were suffered unremittingly from their first appearance, but that these were occasional recurrences which might have been attributed to transient cases rather than constitutional inherencies, especially by one not trained to detect peculiarly distinguishing symptoms, which often, as in this case, have to be sought for to certainly determine by the most careful and involved analysis; and certainly too, without the heft of Dr. Parrish's statement, that he informed the insured before the date of his application that he was suffering from it, the evidence could not be said to be anything less than preponderative that he did not know or suspect that he had consumption, for aside from this insistence no one else is supposed to have told him.

What effect, therefore, should be given the statement of Dr. Parrish that he so informed him, made at a time possibly as a result of professional routine suggestion rather than because of any distinct remembrance. Is this not in fact the most charitable view to be taken of the Doctor's testimony, because at a time when his particular attention was called to the matter, and to the destructive construction that was being placed upon an affidavit that the doctor himself had made, in order to assist the insured in his application to the Government for an allowance, he makes another affidavit, or certificate or statement especially designed to negative any such statement or construction that the insured ever knew from him before September 14, 1922 that he was suffering from any lung trouble. It is possible the doctor may have confused this telling with the time when the insured asked him if he knew with the view of getting his affidavit for the need of government action. But viewed in any aspect, the principal point of the last affidavit, and the circumstantiality of detail in the statement make it exceedingly difficult if not entirely impossible to reconcile this last affidavit with the fact, if existent, that the doctor knew or had told him of his trouble before he applied for insurance with the defendant. This was the very crux of the trouble that the complainant was having with this defendant, and it was intended by this last statement to remove this very difficulty, which was the imputation of knowledge and concealment that the defendant was urging against the claim of contract liability. It is small wonder that one should hestitate to give this statment of the doctor, under the circumstances

surrounding it, weight that, in overcoming the otherwise preponderating case, would likewise to a great extent discredit the doctor, by furnishing proof that he was willing, notwithstanding his knowledge that he had communicated information to the complainant that he had tuberculosis, to aid or assist him in perpetrating a fraud upon the defendant, by making any kind of a statement designed to mislead the defendant and make it believe something directly contrary to the facts.

We do not think this character of testimony should be taken or regarded as overcoming the complianant's denial of such knowledge, strengthened and corroborated as he was shown to be in the chancellor's opinion, especially where the adverse facts and circumstances shown are not necessarily indicative of knowledge and concealment. Fraud of this character relied upon to avoid the payment of a life insurance policy will not be presumed, but it should be made to appear by such convincing proof as not to leave any doubt as to its preponderating character. Nor do we think the question of omission to refer to the examination in July, 1920 by Dr. Parrish was material under the statute. It was no intentional concealment. He was not consulted by the complainant at the time. He was in his home merely as a visitor, or caller. The doctor voluntarily examined him with a floroscope, charged nothing for it, nor advised the complainant as to any discovery, merely telling him to take care of himself and eat nourishing food. This circumstance was not remembered at the time of his examination for insurance, nor was it material we think, under the statute, if it had been. The falsity sought to be implied from this omission is predicated upon his answers to the following questions in his application:

"Q. Have you ever consulted a physician for or have you ever suffered from any ailment or disease of the heart, blood vessels or lungs?"

A. "No."

Q. "Have you consulted a physician for any ailment or disease not included in your above answer?"

A. "Tonsillectomy in Apr. 1922, 2 weeks, Dr. J. L. Bryan, Nashville, Tenn."

Q. "What physician or physicians, if any, not named above, have you consulted or been treated by, within the last five years, and for what illness or ailment?"

A. "None."

This first was not a false statement. He had not consulted a physician for any of those troubles. It was in no sense an application for or reception of any advice from a physician about these matters, as appears from the proof. The friendly and wholly voluntary action of Dr. Parrish in July, 1920, and its uncommunicated

disclosures was not any consultation of a physician upon the part of the original. complainant, nor should his subsequently availing himself of what the doctor discovered at the time be taken as a circumstance again him. It was fortunate, if not regarded as providential. Antecedent circumstances, viewed in the light of the subsequently ascertained fact of tuberculosis, are liable to be given undue weight, unless the known optimism with which we are prone to regard our own health be remembered. There is made to appear a false statement in answer to the last two questions quoted, but the assured at the time of his examination told Dr. Madden, defendant's examining agent, of the visit to Dr. Parrish in April as to his tonsils, upon which Dr. Bryant operated, but Dr. Madden did not regard it as of sufficient importance to record, and we do not think there was any purpose to deceive the defendant. The agent knew of this visit. As to the leaking heart, it does not appear from the record when it was discovered by the original complainant, though presumably after his application for insurance by the defendant; for he states that when the policy arrived he was, to the best of his knowledge and belief, in good health.

We think the chancellor, with the exception hereinafter stated, correctly determined the case on its merits, and that no question of estoppel arises upon the record. The claim that the defendant with full knowledge of the condition of original complainant's health received the payment of the premiums, is not borne out by the proof. The policy acknowledges receipt of the first premium, which was paid for in notes of the assured to the agent, Jarvis, who it seems accounted to the company for the first payment, which as stated was in the policy acknowledge paid, and he became thereby entitled to the notes, and a payment to him of the notes thereafter was not, or at least it was not shown to be a payment to the company, nor could any such transaction, or any other with the soliciting agent merely, and not connected or within the scope of his special agency, effect the company with notice, and the authorities stated are not in point. All this occurred after the policy was delivered, and the soliciting agent is not shown to have possessed any authority to negotiate or to collect any other premiums for the defendant. However, it was charged with the duty of tendering back this premium, which it did, and the company is not shown to have had full knowledge of original complainant's condition until about August 20, 1923, and on September 26, 1923, it notified original complainant of the cancellation of the policy, sending him check returning the original premium. Before such information notice of the payment due on September 14, 1923 had been sent to the original complainant, and he sent check, which was returned to him, and the defendant declined to receive same upon the ground that the policy had been

cancelled. We think it thus appears that the company was not estopped by the reception of any premium after knowledge of such disability.

However, as to such disability benefit, the policy contained this clause:

"These disability benefits will not apply if the disability of the insured shall result from military or naval service in time of war."

We think the proof shows that the disability was the result of military or naval service in time of war, and that therefore the monthly income represented by the $750.00 and interest was not recoverable under the terms of the policy, and we disagree with the chancellor in this regard, and that no disability not insured against could excuse the failure to pay the premium on other matters that were insured against. The complainants should have been allowed to recover only the sum of $5000.00, with interest, which should also be credited with the amount of the 1923 premium. To this extent the assignment of error is sustained, and in all other respects overruled.

The chancellor's decree will be modified in the particulars indicated and affirmed. The costs of the cause will be divided equally.

Thompson and Portrum, JJ., concur.